IN THE CIRCUIT COURT IN THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA

JERELYN ZACHE, CHIQUITA BREWTON,
CHIQUITA BREWTON on behalf of her minor
Child A.B., JEANINE CADY, JULIE
COOMER, LORI FARRINGTON, STEPHANIE
GOMEZ, JENNIFER LUFFMAN, JESSICA
MCCONNAUGHEY, ELEANOR PEETE,
CARL PRATHER, for themselves and on behalf of
all others similarly situated,

       Plaintiffs,

v.

THE 3M COMPANY (f/k/a Minnesota
Mining and Manufacturing, Co.); TYCO FIRE
PRODUCTS L.P., as successor-in-interest to
THE ANSUL COMPANY; BUCKEYE FIRE
EQUIPMENT CO.; CHEMGUARD, INC.;
NATIONAL FOAM, INC.; KIDDE FIRE
FIGHTING, INC. (f/k/a CHUBB NATIONAL
FOAM, INC. f/k/a NATIONAL FOAM,
INC.), individually and as successor in interest
to NATIONAL FOAM, INC.; KIDDE PLC,
INC. (f/k/a WILLIAMS US INC. f/k/a
WILLIAMS HOLDINGS, INC.), individually
and as successor in interest to NATIONAL
FOAM, INC.; KIDDE-FENWAL, INC. (f/k/a
FENWAL INC.), individually and as
successor-in-interest to NATIONAL FOAM,
INC.; and UTC FIRE & SECURITY
AMERICAS CORPORATION, INC. (f/k/a
GE INTERLOGIX, INC.), individually and as
successor-in-interest to NATIONAL FOAM,
INC., FLORIDA STATE FIRE COLLEGE,
COLLEGE OF CENTRAL FLORIDA,

       Defendants.

_____/

**<u>CLASS ACTION COMPLAINT WITH
INDIVIDUAL CLAIMS AND DEMAND FOR JURY TRIAL</u>**

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 5

II. JURISDICTION AND VENUE ............................................................................ 8

III. THE PARTIES ..................................................................................................... 9

    Plaintiffs ................................................................................................................. 9

    Defendants ............................................................................................................ 17

IV. FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION ................... 22

    A.  Manufacture and Use of Aqueous Film-Forming Foam ("AFFF") ............................. 22

    B.  Defendants' Knowledge of the Threats to Public Health and the Environment
    Posed by PFOS and PFOA ................................................................................ 24

    C. Health Advisories and Health Effects relating to Perfluorooctane Sulfonate
    ("PFOS") and Perfluorooctanoic Acid ("PFOA") ................................................ 36

    D. AFFF Usage and the Resulting PFOS and PFOA Contamination of  the Campus.......39

    E. The Plaintiffs and Putative Class Members' Exposures to PFOS and PFOA and
    Damages ......................................................................................................... 41

    F.  AFFF Containing PFOS and PFOA is Fungible and Commingled in the
    Groundwater ................................................................................................... 43

    G. Market Share Liability, Alternative Liability, Concert of Action, Enterprise
    Liability .......................................................................................................... 44

V.  CLASS ALLEGATIONS ......................................................................................... 44

    A. Class Definition ................................................................................................ 45

    B. Numerosity and Ascertainability ....................................................................... 47

    C. Typicality ........................................................................................................ 48

    D.  Adequacy of Representation ............................................................................. 48

    E.  Commonality.....................................................................................................49

F.  Superiority……………………………………………………………..………..50

**VI. CAUSES OF ACTION** .......................................................................................**50**

Count I – Negligence and Gross Negligence ................................................50

Count II – Strict Liability ............................................................63

Count III – Medical Monitoring ....................................................69

Count IV – Contaminated Property Mitigation, Remediation, Testing and Monitoring ...74

Count V - Punitive Damages…........................................................77

**VIII. PRAYER FOR RELIEF** ...................................................................**78**

**IX. DEMAND FOR JURY TRIAL** ..........................................................**79**

**X.  DESIGNATION OF EMAIL ADDRESS**…………………………………………………..79

UNOFFICIAL DOCUMENT

## CLASS ACTION COMPLAINT WITH
## INDIVIDUAL CLAIMS AND DEMAND FOR JURY TRIAL

Plaintiffs, JERELYN ZACHE; CHIQUITA BREWTON, CHIQUITA BREWTON on behalf of her minor Child A.B., JEANINE CADY, JULIE COOMER, LORI FARRINGTON, STEPHANIE GOMEZ, JENNIFER LUFFMAN, JESSICA MCCONNAUGHEY, ELEANOR PEETE, CARL PRATHER, for themselves and on behalf of all others similarly situated, for themselves and on behalf of all others similarly situated (collectively "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint and Demand for Jury Trial, and make these allegations based on information and belief against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT CO.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC. (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC. (f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC. (Collectively "Defendants"), FLORIDA STATE FIRE COLLEGE (hereinafter "FIRE COLLEGE"), and COLLEGE OF CENTRAL FLORIDA (The campus and grounds occupied previously by FIRE COLLEGE and currently occupied by COLLEGE OF CENTRAL FLORIDA shall herein after be referred to collectively as the "THE CAMPUS", unless otherwise specified.), and allege as follows:

## I. <u>INTRODUCTION</u>

1.  The Plaintiffs, for themselves and on behalf of a Class of similarly-situated individuals, bring this action for damages sustained to their person and for medical monitoring resulting from exposure to aqueous film-forming foams ("AFFF") containing the toxic chemicals perfluorooctane sulfonate ("PFOS") and/or perfluorooctanoic acid ("PFOA") and/or from exposure to groundwater, surface water, and affected areas contaminated with PFOS and/or PFOA from AFFF products that were manufactured, designed, sold, supplied and/or distributed by each of the above-named Defendants, individually or through their predecessors or subsidiaries.

2.  PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. PFOS and PFOA, and/or their precursors, were at all times material hereto components of the Defendants' AFFF products.

3.  AFFFs are firefighting suppressant agents used in training and firefighting activities for fighting Class B fires. Class B fires include fires involving hydrocarbon fuels such as petroleum and/or other flammable liquids and/or fuels.

4.  The Plaintiffs and Putative Class Members represent all students, staff members, instructors, professors, personnel, visitors and neighbors and/or adjacent property owners of the COLLEGE OF CENTRAL FLORIDA located at 11655 NW Gainesville Road, Ocala, Florida 34482.

5.  THE CAMPUS was formerly occupied by FIRE COLLEGE and is currently occupied by the COLLEGE OF CENTRAL FLORIDA (THE CAMPUS includes the grounds, above surface and below surface, manmade and/or natural water wells, physical buildings, plumbing, facilities and/or infrastructure of any kind, unless a distinction is required and stated).

6.    FIRE COLLEGE trained firefighters in fire suppression and containment. The firefighter students were instructed to and trained in the use of fire suppression methods and products including AFFF's containing PFOS and PFOA.

7.    On or about August 2018, the Florida Department of Environmental Protection Agency ("FD-EPA"), began testing wells at THE CAMPUS and found significantly elevated levels of PFOS and PFOA greater than the national average. The PFOS and PFOA levels vastly exceed the United States Environmental Protection Agency's ("EPA") health advisory limit 0.07 parts per billion (ppb) or 70 parts per trillion (ppt).

8.    The FD-EPA's findings that the grounds and water supplies at THE CAMPUS were contaminated with PFOS and PFOA were not provided and/or communicated and/or otherwise made known to the Class Plaintiffs and the Putative Class Members.

9.    PFOS and PFOA are highly toxic and carcinogenic chemicals. The Defendants knew or should have known that PFOS and PFOA are persistent when released into the environment and present significant risks to human health and the environment.

10.  Notwithstanding, the Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed AFFF products containing PFOS and/or PFOA when they knew or reasonably should have known that these harmful compounds would be released into the air, soil, and groundwater during firefighting training exercises and in firefighting emergencies.

11.  Moreover, Defendants designed, manufactured, marketed, sold and distributed AFFF products with full knowledge that they would threaten the health and welfare of firefighters and other individuals, including but not limited to Class Plaintiffs and the Putative Class Members, when exposed to these dangerous and hazardous FOREVER CHEMICALS.

6

12. At all times material hereto, Defendants' AFFF products containing PFOS and/or PFOA were used by fire fighter students, instructors, and others at FIRE COLLEGE, in their intended manner and for their intended purpose, without significant change to the products' condition.

13. PFOS and PFOA are highly stable in the environment and resist typical environmental degradation processes. As a result, when released into the environment they persist for an indeterminate time earning them the now common designation of "FOREVER CHEMICALS."

14. PFOS and PFOA are designed and manufactured by Defendants to easily dissolve in water resulting in the ability to quickly move through water. This characteristic results in the uncontained migration of PFOS and PFOA to geographic areas well beyond the immediate use area, including but not limited to CAMPUS ADJACENT PROPERTIES.

15. The Defendants failed to provide any warnings and/or instructions regarding the proper methods of handling the AFFF (PFOS / PFOA) products. Having received no warnings and/or inadequate warnings and/or instructions and otherwise being unaware of the dangerous properties of the Defendants' AFFF (PFOS / PFOA) products, fire fighter students, their instructors and others trained at FIRE COLLEGE with and utilized Defendants' products as intended by the Defendants.

16. As a direct and proximate cause of Defendants failure to provide said warnings and/or instructions, fire fighter students, their instructors and others took no precautionary measures to prevent the contamination of the environment, grounds and water supplies at THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

17. Due to the persistent and widespread contamination of THE CAMPUS and CAMPUS ADJACENT PROPERTIES, Class Plaintiffs and the Putative Class Members were exposed to AFFF (PFOS / PFOA) without their knowledge and/or consent.

18. Class Plaintiffs' and Putative Class Members consumption, inhalation or dermal absorption of PFOS and/or PFOA from Defendants' AFFF products caused Class Plaintiffs and Putative Class Members to develop numerous serious medical conditions, including, but not limited to, thyroid disease, kidney cancer and/or end-stage kidney disease, ulcerative colitis, and hypercholesterolemia.

19. Over the course of the past several decades, the Class Plaintiffs and Putative Class Members were routinely exposed to the Defendants' AFFF (PFOA / PFOS) products and/or were exposed to PFOS and PFOA contaminated grounds and/or water at THE CAMPUS. The contamination directly and proximately resulted from the use and storage of Defendants' AFFF products containing PFOS and PFOA resulting in significant personal injuries to Class Plaintiffs and the Putative Class Members, and the need for medical monitoring.

20. Furthermore, the contamination directly and proximately resulting from the use and storage of Defendants' AFFF products containing PFOS and PFOA caused contamination of the CAMPUS ADJACENT PROPERTIES.

## II. JURISDICTION AND VENUE

21. This Complaint was filed as an original action in this Circuit.

22. This Court has subject matter jurisdiction over this action as damages exceed fifty thousand dollars ($50,000.00), exclusive of interest and costs.

23. This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with the State of Florida, including, among other things, purposefully marketing, selling and/or distributing their AFFF products within the State of Florida, and because they have the requisite minimum contacts with the State necessary to constitutionally permit this Court to exercise jurisdiction.

24. Moreover, the Venue is proper in this Circuit because the events, acts of commission and/or omission, giving rise to the claim occurred in this Circuit and because the subject contaminated site(s) that are the subject of this action are located within this Circuit.

## III. THE PARTIES

### A. Plaintiffs and Class Representatives

25. Plaintiff Jerelyn Zache is a resident of Sumter County, Florida, who currently resides at 7471 CR 247, Lake Panasoffkee, Florida, 33538. At all material times, Plaintiff Jerelyn Zache works as a Professor/Program Manager in a Dental Hygiene Program at the COLLEGE OF CENTRAL FLORIDA, Hampton Center in Ocala, Florida. During Plaintiff Jerelyn Zache's employment at COLLEGE OF CENTRAL FLORIDA, Hampton Center, she was exposed to significantly elevated levels of PFOS and PFOA in the Defendants' AFFF products as a direct and proximate result of the contamination in the wells and grounds at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, including, but not limited to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

26. Plaintiff Jerelyn Zache has suffered from Metastatic Breast Cancer, Invasive Ductile Carcinoma, Triple Positive in left breast that has spread to the Lymphatic system, leaving her with no breast. Plaintiff also developed heart issues due to the treatment of chemo, radiation and target therapy. Plaintiff also has Lymphedema and has been put into early Menopause as a direct and proximate result of her exposure to PFOA and PFOS and is at an increased risk of developing several health effects, including but not limited to effects on the liver and immune system, kidney cancer, testicular cancer, high cholesterol, colitis, and autoimmune diseases.

27. Moreover, Plaintiff Jerelyn Zache has a legitimate fear of developing debilitating injuries in the future as a result of her exposure to PFOS and PFOA, including but not limited to effects on

the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases

28. Plaintiff Chiquita Brewton is a resident of Ocala, Florida, who has resided at all material times at 9206 SE 48th CT Road, Ocala, FL 34480. At all material times, Plaintiff Chiquita Brewton was a student at COLLEGE OF CENTRAL FLORIDA and now works as a Dental Assistant Instructor at the College of COLLEGE OF CENTRAL FLORIDA, Hampton Center in Ocala, Florida. During Plaintiff Chiquita Brewton's employment at COLLEGE OF CENTRAL FLORIDA, Hampton Center, she was exposed to significantly elevated levels of PFOS and PFOA in the Defendants' AFFF products as a direct and proximate result of the contamination in the wells and grounds at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, including, but not limited to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

29. Plaintiff Chiquita Brewton has suffered from Polycystic Ovary Syndrome, Hyperlipidemia, Obesity, Hypoglycemia. Plaintiff Daughter A.B, a Minor Child, was diagnosed with extragonadal mature teratoma on left kidney and left renal artery stenosis with secondary hypertension and chronic kidney disease Stage I/II as a direct result of her exposure to PFOS and PFOA. She and her daughter A.D are at an increased risk of developing several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, and autoimmune diseases.

30. Plaintiff Chiquita Brewton has a legitimate fear of developing debilitating injuries in the future as a result of her exposure to PFOS and PFOA, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, and autoimmune diseases.

31. Plaintiff Jeanine Cady is a resident of Ocala, Florida, who has resided at all material times at 1850 SE 18TH Ave, Apt 1304, Ocala, FL 34471. At all material times, Plaintiff Jeanine Cady works at the Dental Hygiene Program at the COLLEGE OF CENTRAL FLORIDA, Hampton Center, in Ocala, Florida. During Plaintiff Jeanine Cady's employment at COLLEGE OF CENTRAL FLORIDA, Hampton Center, she was exposed to significantly elevated levels of PFOS and PFOA in the Defendants' AFFF products as a direct and proximate result of the contamination in the wells and grounds at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, including, but not limited to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

32. Plaintiff Jeanine Cady suffers from Parafalcine Meningioma as a direct result of her exposure to PFOS and PFOA and is at an increased risk of developing several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

33. Plaintiff Jeanine Cady has a legitimate fear of developing debilitating injuries in the future as a result of her exposure to PFOS and PFOA, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, colitis, and autoimmune diseases.

34. Plaintiff Julie Coomer is a resident of Ocala, Florida, who has resided at all material times at 3565 SE 29th CT, Ocala, FL 34471. At all material times, Plaintiff Julie Coomer works at the COLLEGE OF CENTRAL FLORIDA, Hampton Center in Ocala, Florida. During Plaintiff Julie Coomer's employment at COLLEGE OF CENTRAL FLORIDA, Hampton Center, she was exposed to significantly elevated levels of PFOS and PFOA in the Defendants' AFFF products as a direct and proximate result of the contamination in the wells and grounds at THE CAMPUS and

CAMPUS ADJACENT PROPERTIES, including, but not limited to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

35. Plaintiff Julie Coomer has suffered from Chronic Obstructive Pulmonary Disease (COPD), Pre-Diabetic, Thyroid and Polycystic Ovary Syndrome (PCOS) as a direct result of her exposure to PFOS and PFOA and is at an increased risk of developing several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

36. Plaintiff Julie Coomer has a legitimate fear of developing debilitating injuries in the future as a result of her exposure to PFOS and PFOA, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

37. Plaintiff Lori Farrington is a resident of Ocala, Florida, who has resided at all material times at 2760 NE 66th Street, Ocala, FL 34479. At all material times, Plaintiff Lori Farrington works as a Dental Assistant Instructor at the COLLEGE OF CENTRAL FLORIDA, Hampton Center in Ocala, Florida. During Plaintiff Lori Farrington's employment as a Dental Assistant Instructor she was exposed to significantly elevated levels of PFOS and PFOA as a direct and proximate result of the contamination in the wells and grounds at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, including, but not limited to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

38. Plaintiff Lori Farrington has suffered from Chronic Sinusitis and Sinus Problems as a direct result of her exposure to PFOS and PFOA and is at an increased risk of developing several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

39. Plaintiff Lori Farrington has a legitimate fear of developing debilitating injuries in the future as a result of her exposure to PFOS and PFOA, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

40.  Plaintiff Stephanie Gomez is a resident of Ocala, Florida, who has resided at all material times at 3220 NE 42nd PL, Ocala, FL 34479. At all material times, Plaintiff Stephanie Gomez works as a Staff Assistant in the Dentistry Program at the COLLEGE OF CENTRAL FLORIDA, Hampton Center in Ocala, Florida. During Plaintiff Stephanie Gomez's employment at the COLLEGE OF CENTRAL FLORIDA, Hampton Center, she was exposed to significantly elevated levels of PFOS and PFOA in the Defendants' AFFF products as a direct and proximate result of the contamination in the wells and grounds at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, including, but not limited to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

41. Plaintiff Stephanie Gomez has suffered from Asthma and Polycystic Ovary Syndrome (PCOS) as a direct result of her exposure to PFOA and PFOS and is at an increased risk of developing several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

42. Plaintiff Stephanie Gomez has a legitimate fear of developing debilitating injuries in the future as a result of her exposure to PFOS and PFOA, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

43. Plaintiff Jennifer Luffman is a resident of Ocala, Florida, who has resided at all material times at 3261 NE 104th Street, Anthony, FL 32617. At all material times, Plaintiff Jennifer Luffman works

as a Full time Instructor and Program Manager at the COLLEGE OF CENTRAL FLORIDA, Hampton Center in Ocala, Florida. During Plaintiff Jennifer Luffman's employment at COLLEGE OF CENTRAL FLORIDA, Hampton Center, she was exposed to significantly elevated levels of PFOS and PFOA in the Defendants' AFFF products as a direct and proximate result of the contamination in the wells and grounds at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, including, but not limited to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

44. Plaintiff Jennifer Luffman suffers from heavy bleeding and extreme cramping. Also, she had a large pre-cancerous polyp removed and Menorrhagia Endometriosis, Chronic Endometritis  as a direct result of her exposure to PFOA and PFOS and is at an increased risk of developing several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

45. Plaintiff Jennifer Luffman has a legitimate fear of developing debilitating injuries in the future as a result of her exposure to PFOS and PFOA, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

46. Plaintiff Jessica McConnaughey is a resident of Ocala, Florida, who has resided at all material times at 6230 SE 1365th Street, Summerfield, FL 34491. At all material times, Plaintiff Jessica McConnaughey works as a teacher in the Dental Hygienist Program at the COLLEGE OF CENTRAL FLORIDA, Hampton Center in Ocala, Florida. During Plaintiff Jessica McConnaughey's employment at the COLLEGE OF CENTRAL FLORIDA, Hampton Center, she was exposed to significantly elevated levels of PFOS and PFOA in the Defendants' AFFF products as a direct and proximate result of the contamination in the wells and grounds at THE CAMPUS

and CAMPUS ADJACENT PROPERTIES, including, but not limited to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

47. Plaintiff Jessica McConnaughey suffers from Abnormal Bleeding resulting in a scheduled Hysterectomy as a direct result of her exposure to PFOA and PFOS and is at an increased risk of developing several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

48. Plaintiff Jessica McConnaughey has a legitimate fear of developing debilitating injuries in the future as a result of her exposure to PFOS and PFOA, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

49. Plaintiff Eleanor Peete is a resident of Ocala, Florida, who has resided at all material times at 8640 SW 94th Street, Unit B, Ocala, FL, 34481. At all material times, Plaintiff Eleanor Peete works as a Staff Assistant at the COLLEGE OF CENTRAL FLORIDA, Hampton Center in Ocala, Florida. During Plaintiff Eleanor Peete's employment at COLLEGE OF CENTRAL FLORIDA, Hampton Center, she was exposed to significantly elevated levels of PFOS and PFOA in the Defendants' AFFF products as a direct and proximate result of the contamination in the wells and grounds at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, including, but not limited to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

50. Plaintiff Eleanor Peete suffers from Diabetes, Parkinsonian Syndrome and Parkinson disease as a direct result of her exposure to PFOA and PFOS and is at an increased risk of developing

several health effects, including but not limited to effects on the liver and immune system, kidney

cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

51. Plaintiff Eleanor Peete has a legitimate fear of developing debilitating injuries in the future as

a result of her exposure to PFOS and PFOA, including but not limited to effects on the liver and

immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune

diseases.

52. Plaintiff Carl Prather is a resident of Ocala, Florida, who has resided at all material times at

13440 SW 88th Terrace, Ocala, FL 34473. At all material times, Plaintiff Carl Prather works as a

Public Safety Officer at the COLLEGE OF CENTRAL FLORIDA, Hampton Center in Ocala,

Florida. During Plaintiff Carl Prather's employment at the COLLEGE OF CENTRAL FLORIDA,

Hampton Center, he was exposed to significantly elevated levels of PFOS and PFOA in the

Defendants' AFFF products as a direct and proximate result of the contamination in the wells and

grounds at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, including, but not limited

to, the accumulation of PFOS and PFOA in all relevant areas of THE CAMPUS and CAMPUS

ADJACENT PROPERTIES.

53. Plaintiff Carl Prather suffered from Prostate Cancer as a direct result of his exposure to PFOA

and PFOS and is at an increased risk of developing several health effects, including but not limited

to effects on the liver and immune system, kidney cancer, testicular cancer, high cholesterol, colitis,

and autoimmune diseases.

54. Plaintiff Carl Prather has a legitimate fear of developing debilitating injuries in the future as a

result of his exposure to PFOS and PFOA, including but not limited to effects on the liver and

immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune

diseases.

## B. DEFENDANTS

55. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

56. Beginning before 1970 and until at least 2002, 3M manufactured, distributed, and sold AFFF containing PFOS.

57. According to 3M, 3M was the only known manufacturer of AFFF containing PFOS and PFOS precursors in the United States. 3M also manufactured PFOA.

58. 3M manufactured and/or distributed and/or sold AFFF foam containing PFOS and/or PFOA which was used at FIRE COLLEGE.

59. Defendant Tyco Fire Products, L.P. ("Tyco") is a limited partnership formed in the State of Delaware with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI]. Upon information and belief, Tyco's partners are Central Sprinkler LLC and Fire Products Holding LLC, whose members are wholly owned by Tyco Fire & Security (US) Management, Inc., which is incorporated in Nevada and its principal place of business is in New Jersey. Accordingly, Tyco is a citizen of Nevada and New Jersey.

60. Tyco is the successor-in-interest of The Ansul Company ("ANSUL"), having acquired Ansul in 1990. (Ansul and Tyco (as the successor in interest to Ansul), will hereinafter be collectively referred to as "TYCO/ANSUL.")

61. Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained fluorocarbon surfactants containing PFOA. After Tyco acquired Ansul in 1990,

17

TYCO/ANSUL continued to manufacture, distribute and sell AFFF that contained fluorocarbon surfactants containing PFOA.

62. TYCO/ANSUL manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at FIRE COLLEGE.

63. Defendant Buckeye Fire Equipment Company ("BUCKEYE") is a foreign corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

64. Buckeye manufactured, distributed and/or sold AFFF containing PFOA which was used at FIRE COLLEGE.

65. Defendant CHEMGUARD, INC. ("CHEMGUARD") is a Texas corporation with its principal place of business in Texas.

66. Beginning in or around 1994, CHEMGUARD began manufacturing AFFF that contained PFOA.

67. CHEMGUARD manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at FIRE COLLEGE.

68. Defendant NATIONAL FOAM, INC. ("NATIONAL FOAM") is a Delaware corporation, having its principal place of business and corporate headquarters located in Angier, North Carolina.

69. At all times relevant, NATIONAL FOAM designed, manufactured, and sold AFFF products, including, but not limited to, AER-O-Foam XL-3 3%, used in training operations and for emergency fire-fighting situations including at FIRE COLLEGE.

70. Defendant KIDDE FIRE FIGHTING, INC. (f/k/a Chubb National Foam, Inc. f/k/a National Foam Inc.), is a North Carolina corporation having a principal place of business at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615. At all times relevant, KIDDE FIRE FIGHTING,

INC. designed, manufactured and sold AFFF used in training operations and for emergency fire-fighting situations including at FIRE COLLEGE.

71. KIDDE FIRE FIGHTING, INC., is sued individually, and as successor in interest to National Foam, Inc.

72. Defendant KIDDE PLC, INC. (f/k/a Williams US Inc. f/k/a Williams Holdings, Inc.), is a Connecticut corporation having a principal place of business at One Carrier Place, Farmington, Connecticut 06302. At all times relevant, Kidde plc, Inc. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at FIRE COLLEGE.

73. KIDDE PLC, INC., is sued individually, as a successor in interest to NATIONAL FOAM, INC.

74. Upon information and belief, WILLIAMS HOLDINGS, INC., was incorporated on October 10, 1987, and later dissolved on December 31, 1990.

75. Upon information and belief, John F. Hannon was the CEO and Secretary of WILLIAMS HOLDINGS, INC. At all times relevant, WILLIAMS HOLDINGS, INC. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at FIRE COLLEGE.

76. Upon information and belief, WILLIAMS CORPORATION was founded in 1997 and dissolved on October 26, 2000. Upon information and belief, John F. Hannon was the CEO of WILLIAMS CORPORATION, as well as the Treasurer of KIDDE FIRE FIGHTING, INC. prior to the dissolution of WILLIAMS CORPORATION.

77. Upon information and belief, WILLIAMS HOLDINGS, INC., a Delaware corporation, filed as a foreign corporation with the Massachusetts Secretary of State on June 2, 1987.

78. Upon information and belief, John F. Hannon changed the name of WILLIAMS HOLDINGS, INC to WILLIAMS HOLDINGS US, INC., on February 12, 1998.

79. Upon information and belief, Williams Holdings US, Inc. became Kidde plc, Inc. on November 15, 2000.

80. WILLIAMS HOLDINGS, INC. is named as successor in interest to NATIONAL FOAM, INC.

81. Defendant KIDDE-FENWAL, INC. (f/k/a FENWAL, INC.) is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, Massachusetts 01721. At all times relevant, KIDDE-FENWAL, INC. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at FIRE COLLEGE.

82. Upon information and belief, FENWAL, INC. was incorporated on June 21, 1988, and later changed its name to KIDDE-FENWAL, INC.

83. Upon information and belief, the Canadian Intellectual Property Office has registered the NATIONAL FOAM trademark to KIDDE-FENWAL, INC., formerly registered to KIDDE FIRE FIGHTING, INC.

84. KIDDE-FENWAL, INC., is sued individually, and as successor in interest to NATIONAL FOAM, INC.

85. Defendant UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC.), is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. At all times relevant, UTC FIRE & SECURITY AMERICAS CORPORATION, INC. designed, manufactured and sold AFFF used for training operations and fighting fires including at FIRE COLLEGE.

86. Upon information and belief, KIDDE-FENWAL, INC. is part of the UTC CLIMATE CONTROL & SECURITY UNIT OF UNITED TECHNOLOGIES CORPORATION.

87. UTC FIRE & SECURITY AMERICAS CORPORATION, INC., is sued individually, and as successor in interest to National Foam, Inc.

88. NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC., f/k/a CHUBB NATIONAL FOAM, INC., F/K/A NATIONAL FOAM INC., individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE PLC, INC., f/k/a WILLIAMS US INC., f/k/a WILLIAMS HOLDINGS, INC., individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC., individually and as successor in interest to NATIONAL FOAM, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC., f/k/a GE INTERLOGIX, INC.; shall collectively be referred to herein as "NATIONAL FOAM."

89. At all times relevant to the present litigation, National Foam designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous locations throughout the country, including at FIRE COLLEGE.

90. NATIONAL FOAM and its predecessors have also used the "ANGUS FIRE" trade name and brand name for sales of AFFF in the United States for a number of decades. References to "NATIONAL FOAM" herein shall also refer to AFFF commercially manufactured, marketed and sold under the "ANGUS" name and "ANGUS FIRE" brand.

91. Defendant FIRE COLLEGE at all material times hereto was a state owned and operated facility. It was part of the Florida Department of Financial Services, Division of the State Fire Marshall.

92. FIRE COLLEGE sold and/or transferred THE CAMPUS to Defendant COLLEGE OF CENTRAL FLORIDA.

93. Defendant COLLEGE OF CENTRAL FLORIDA is a college operated and managed by District Board Trustees of Florida Community Colleges which is appointed by the Governor of Florida and confirmed by the Florida State Senate.

IV. <u>FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION</u>

A.  MANUFACTURE AND USE OF AQUEOUS FILM-FORMING FOAM ("AFFF")

94. In 1947, 3M began producing PFOA produced by a unique and patented process known as electrochemical fluorination ("ECF"). The ECF process resulted in a product that contains PFOS, some of which degrades into PFOA.

95. 3M was the only company to manufacture AFFF that contained PFOS.

96. Significantly, PFOA is a man-made, manufactured chemical not found in nature. PFOA was used to make household and commercial products that resist heat and chemical reactions, and has many uses, including repelling oil, stains, grease, and water.

97.  In fact, all PERFLOURINATED COMPOUNDS ("PFCs") are manmade chemicals that do not exist in nature.

98.  AFFF is synthetically formed by combining fluorine free hydrocarbon foaming agents with surfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film forming foam.

99.  AFFF containing fluorinated surfactants gained popularity because they have a better firefighting capability than plain water due to their surface-tension lowering properties, essentially smothering the fire and starving it of oxygen. And so, the Foam Industry was born.

100. AFFF is designated as a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

101. In 1951, 3M began selling its PFOA to other chemical companies, including DUPONT.

102. In the mid-1960s, AFFF was introduced commercially and rapidly became the primary firefighting foam in the U.S., including the State of Florida, and in many parts of the world.

103. Other companies, such as Defendants TYCO/ANSUL, BUCKEYE, NATIONAL FOAM, and CHEMGUARD began manufacturing AFFF using PFOA that they produced themselves or purchased from other companies. Defendants' AFFF products were distributed into the stream of commerce for use at airports, fire departments, training facilities and industrial facilities across the nation, including the State of Florida.

104. In the Foam Industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water. AFFF concentrates contain about 60-90% water and have a fluorine content of about 0.3 – 1.8%.

105. At all times material hereto, Defendants manufactured AFFF products consistent with the Foam Industry concentrates that contained fluorocarbon surfactants including PFOS, PFOA, and/or certain other perfluorinated compounds ("PFCs") that degrade into PFOS and PFOA.

106. At all material times hereto, Defendants 3M, TYCO/ANSUL, NATIONAL FOAM, CHEMGUARD and BUCKEYE designed, manufactured, and sold AFFF that was used at FIRE COLLEGE, including, but not limited to, National Foam's AER-O-Foam XL-3 3%, in training operations and for emergency firefighting situations.

## B. DEFENDANTS' KNOWLEDGE OF THE THREATS TO PUBLIC HEALTH AND THE ENVIRONMENT POSED BY PFOS AND PFOA

107. By the early 1960s, 3M knew that PFOS and PFOA were stable, persistent in the environment, and did not biodegrade.

108. Early studies showed that PFC's accumulated in the human body and were "toxic." 3M studies from the 1970s concluded that PFC's were "even more toxic" than previously believed.

109. In or before the 1970s 3M knew or should have known that PFOS and PFOA are highly mobile, persistent, bio-accumulative, biomagnifying, and toxic to humans and wildlife.

110. 3M concealed its knowledge regarding the risk of harm posed by PFCs from the public and government agencies.

111. In or before 1975, 3M concluded that PFOS had permeated the environment to a degree that it was present in the blood of the general population. Since PFOA and PFOS are not naturally occurring, this finding should have alerted 3M their products were the possible, if not, probable source of the PFOS contamination. The finding also should have alerted 3M to the possibility and/or probability that PFOS was highly mobile, persistent, bio-accumulative, biomagnifying and toxic. These findings and characteristics were a possible, if not probable explanation that 3M's products were in fact the source of the absorption and/or presence of PFOS in the general population's blood.

112. In or before 1976, 3M found PFOA in the blood of its workers. This finding should have further alerted 3M to the same concerns raised by the prior year's findings regarding PFOS in the general population's blood.

113. A 1978 study by 3M showed that PFOA reduced the survival rate of fathead minnow fish eggs.

24

114.  Other studies by 3M in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

115.  Studies performed by and/or sponsored by 3M after the 1970s also showed adverse effects from exposure to PFOA and PFOS.

116.  For example, in a 1983 study, 3M found that PFOS caused the growth of cancerous tumors in rats.

117.  A 1983 study proposal by 3M stated that the resistance to degradation of PFOS and PFOA made them "*potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act.*" 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

118.  A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "*a chemical which can cause cancer.*" The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. Evidently, 3M's MSDSs for AFFF failed to provide similar warnings and none of the Defendants notified the EPA.

119.  Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such a substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

120.  3M did not comply with its duty under TSCA, and in April 2006 it agreed to pay EPA a penalty of more than $1.5 million for its failure to disclose studies regarding PFOS or PFOA and other per-fluoroalkyl substances dating back decades, among other things.

121.   At all times material hereto, all Defendants knew or should have known that in its intended and/or common use, AFFF containing PFOA or PFOS would very likely injure and/or threaten public health and the environment. This information and/or knowledge was accessible to and known and/or should have been known by all Defendants.

122.   For example, in 1970 a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS.

123.  Defendants including but not limited to 3M, TYCO/ANSUL, CHEMGUARD, and NATIONAL FOAM/ANGUS, were and/or are members of the firefighting trade association.

124.  Moreover, general knowledge at the level of trade associations including but not limited to firefighters presumes general knowledge among the Defendants.

125.  All of the defendants understood and/or knew and/or had the duty to and should have understood how stable the fluorinated surfactants used in their AFFF formulations are when released into the environment.  from the first sale to their customers but neither warned customers nor provided reasonable instruction on how to manage waste generated from the use of their products. The persistence and contaminating nature of the perfluorinated surfactant manufactured and/or produced by 3m utilized in its AFFF products was well understood prior to the commercial applications of these surfactants at 3M's Cottage Grove facility in Minnesota.

126.  The inventor of 3M's surfactants was J. H. Simons. Simons' 1948 patent (Simons[1]) reports: PFCs are "non-corrosive, and of little chemical reactivity"; "do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures."

---

[1] Simons, J. H., U.S. Patent No. 2,447,717. August 24, 1948.

127.  Simons reported that the surfactants that 3M specified for its AFFF do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. These highly stable chemicals were developed to provide non-reactive solid and liquid chemicals with low surface tensions that could withstand high temperatures and would not react with highly reactive materials such as oxygen (see Simons[2], Bryce[3]). 3M understood that the stability of the carbon-to-fluorine bonds and the lack of attraction for other chemical species prevent these surfactants from undergoing further chemical reactions or degrading under natural processes in the environment (see Simons 1950 published work[4]).

128.  Bryce an employee of 3M, published an authoritative treatise stating "[t]his chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon" (Bryce (1964)).

129.  The thermal stability of 3M's surfactants was understood prior to commercial production. In 1947, two researchers reported that fluorocarbon compounds did not degrade at temperatures as high as $500°$ C ($932°$F), even in the presence of catalytic materials (Grosse, et al..[5]). Simons' patent application further discloses that the chemicals he invented were thermally stable at temperatures up to $750°$ C ($1382°$ F) (see Simons (1948); Simons et al., (1949)). These chemicals are non-reactive and thermally stable due to the strength and stability of the carbon-tofluorine bonds (Simons (1949); Bryce (1950)[6]). Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds. Bryce explained that the fracture of the carbon-to-carbon bonds may take place at very high temperatures from 600 to $1000°$ C ($1112$ to $1832°$ F)

---

[2] Simons, J. H., 1949. Fluorocarbons. Scientific American, Inc., 181(5): 44-47.
[3] Bryce, H. G., 1964. Industrial and Utilitarian Aspects of Fluorine Chemistry. Fluorine Chemistry 5(4): 295-498.
[4] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422.
[5] Grosse, A. V., et al., 1947. Properties of Fluorocarbons. Industrial and Engineering Chemistry, 39(3): 367-374. March.
[6] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

depending on the carbon chain length. He also reported that the carbon-to-fluorine bond is much stronger and can require temperatures of 1200° C (2192° F) to break (Bryce, 1964).

130.    The defendants failed to disclose, warn and/or otherwise provide information in any Material Safety Data Sheet and/or information disclosure regarding the thermal stability of their surfactants. Failure to disclose the nature of the AFFF highly stable chemical ingredients to customers and the general public in danger of potential exposure is and was tantamount to a failure to warn of the indestructible nature the surfactant ingredients and dangers related thereto when released into unprotected water sources and even treatment plants. The remarkable thermal stability of the surfactants used in defendants' formulations means that there is an undisclosed risk of contamination with which customers and end users had to contend. The surfactant additive is so stable that it is indestructible under normal use and environmental conditions; facts which are known by AFFF manufacturers and not apparent to the users of these products.

131.    Defendant 3M was capable of producing a degradable variety of perfluorinated products at its Cottage Grove facility (PFOS, PFOA, and PFBA, in addition to the salts of PFOS, PFOA, and PFBA). All of these surfactants were understood by 3M to readily dissolve in water. In 1962, testing of PFOS-based surfactants indicated that these compounds were very soluble (Guenthner, et al.[7]). Numerous PFCs manufactured by 3M, including fluorocarbon carboxylic acids and fluorocarbon sulfonic acids such as PFOA and PFOS readily dissolve when mixed with water (Bryce (1964)). 3M knew by 1964 that when dissolved, fluorocarbon carboxylic acids and fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions (Bryce (1964)). Later studies by 3M on the adsorption and mobility of FC-

---

[7] Guenthner, R. A., et al., 1962. Surface Active Materials From Perfluorocarboxylic and Perfluorosulfonic Acids, 1(3): 165-168.

95 and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[8]

132.  Defendant 3M understood from the earliest days it acquired the Simons' patents that the surfactants it commercialized had extremely limited reactivity and that the high thermal stability of the perfluorinated carbon chain inhibited degradation in the environment (Bryce, 1950). The breaking of a carbon-to-fluorine bond requires the input of large amounts of energy to overcome the chemical bond between carbon and fluorine. Chemical and physical processes occurring in nature lack sufficient energy to break carbon-to-fluorine bonds and without this input of energy, the carbon-to-fluorine bonds remain intact.

133.  Bryce wrote "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon" (Bryce, 1964). 3M had understanding of the chemical stability of the carbon-to-fluorine bond. It knew that its surfactants were immune to chemical and biological degradation in soils and groundwater.

134.  A 1971 internal memo by H.G. Bryce states that "the thesis that there is 'no naturalsink' for fluorocarbons obviously demands some attention." Hence, 3M understood at the very least that when its AFFF product ingredient was released to the environment it basically will never degrade[9].

135.  In natural environments, the surfactants do not undergo degradation of the carbon-fluorine bonds of the perfluorinated carbon chain. The non-fluorinated, functional group of the chemical will partially degrade, yielding recalcitrant products such as PFOS, PFOA, and PFBA, which then resist further degradation. Basic weathering and degradation reactions, such as hydrolysis, occur

---

[8] 3M, 1978 [3MA10036129]
[9] 3M, 1971 [3MA02496587]

at the non-fluorinated, functional group end of the molecule, producing the original fluorocarbon compound (Pearlson[10]). Depending on the surfactant these reduce to PFOS, PFOA, or PFBA.

136.  Defendant 3M knew that the perfluorinated components in its AFFF product(s) when released to the environment would not degrade the perfluorinated carbon structure, but would remain intact and persist (Bryce, 1950). Nearly 30 years later and after the establishment of a robust market of AFFFs using such ingredients, defendant 3M finally got around to looking at the environmental risks its products pose. See a 1979 3M study[11] which reports on its surfactant FC95 citing multiple studies on toxicity and biodegradability. The study reports that "F-95 was found to be completely resistant to biological test conditions… it appears that waterways are the environmental sink for FC95…"

137.  A 1978 3M biodegradation study[12] reports "… the results of the quite extensive study strongly suggests that FM3422 is likely to persist in the environment for extended period unaltered by metabolic attack."

138.  3M and other defendants chose not to disclose their knowledge of the inability of their surfactants to break down in the natural environment. They failed to warn that their products can contaminate drinking water sources for many decades despite their knowledge that this was a likely outcome from the use of their products.

139.  All of the Defendants are sophisticated and knowledgeable in the art and science of formulating AFFF products. They understood far more about the properties of and the biodegradability of their additives than any other customer. They chose not to use their knowledge

---

[10] Pearlson, W. H., 1950. Fluorocarbon Derivatives. Fluorine Chemistry, 1(14): 463-522.
[11] 3MA10066577 found to be completely resistant to biological test conditions… it appears that waterways are the environmental sink for FC95…"
[12] 3MA00717615

to design safer products. See Ansul[13] which wrote the following about the biodegradation of AFFF:

Biodegradation is a "measure of how completely a substance breaks down in the environment. The biodegradability of a chemical is expressed as a percentage determined by dividing the BOD by the COD and multiplying by 100. The chemical oxygen demand, COD, is the amount of oxygen needed to completely break a chemical down to its most oxidized state (for example: $CO_2$, $H_2O$, and HF) and is a measured analytical value. The biochemical oxygen demand, BOD, is an empirical test that measures a relative oxygen requirement. This test measures the oxygen required for the biochemical degradation of organic and inorganic material… For firefighting foams, this test is conducted for 20 days as opposed to the usual five days for other chemicals because the bacteria require a longer time to acclimate to the test solution of the foam… [b]iodegradation is the percentage ratio of BOD/COD. If that resulting number is higher than 50%, the chemical is determined to be readily biodegradable. If it is below 15%, the chemical is determined to be not biodegradable. Ansul summarized its explanation by noting: If BOD/COD > 50%, then biodegradable; If BOD/COD < 15%, then NOT biodegradable.

140.   The information that Ansul published and widely distributes to its customers is both misleading and deceitful. Ansul's explanation ignores the fact that while the foam stabilizer additives biodegrade, perfluorinated surfactants do not. Dimitrov, et al.[14] report that PFAS when present in the environment does not undergo any further chemical, microbial or photolytic degradation or breakdown. Long before Dimitrov, 3M understood this as shown by its explanation of biodegradability in a 1976 study, noting that hydrocarbon components of a perfluorinated admixture will degrade leaving behind the perfluorinated components which do not biodegrade.[15]

---

[13] Ansul Inc., Environmental Aspects of AFFF and AR-AFFF, White Paper 1017, 2003
[14] Ibid, Dimitrov, S., et al. 2004.
[15] 3MA01252037

31

Once these substances undergo biotic or abiotic degradation, the perfluorinated moiety that remains will be PFOS. The rate of degradation to PFOS is not considered significant and over time these substances are expected to degrade in the environment to environmentally persistent PFOS. These were facts that were known by 3M in the 1960s. These were facts that other AFFF manufacturers knew or should have known; and if they didn't then they simply created their products blindly and without concern as to whether they could cause harm to unprotected water resources and place communities at risk.

141.  Defendant 3M along with Ansul and likely others had an intimate understanding of the poor biodegradation of their fluorochemical compounds. And the remaining Defendants, either had equal understanding or ignored studies and information regarding poor biodegradation of their fluorochemical compounds. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS. 3M characterized the result of the study "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated".[16]

142.  The Ansul Company (Tyco), published a report in 1977 titled Environmentally Improved AFFF.[17] This report acknowledges that AFFFs were understood to be environmentally damaging and could pose potential negative impacts to groundwater quality. Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic…improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness." Its study showed it had the ability to reformulate its AFFF products to be biodegradable, but there is no evidence that any company bothered to do so.

---

[16] 3M, 1976 [3MA01252037]
[17] Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977

143.  Also, in 1979 Defendant 3M carried out a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[18] More than 10 years after 3M began selling its AFFF products it wrote "there has been a general lack of knowledge relative to the environmental impact of these chemicals." This report ominously discloses "If these materials are not biodegradable, what is their fate in the environment?"

144.  As discussed above, neither 3M nor, on information and belief, the other defendants, complied with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF products containing PFOS/A. See TSCA § 8(e).

145.  At all times material hereto, 3M actively and/or negligently through acts of commission and/or omission concealed this knowledge from the public and government regulators.

146.  In or about 1977, TYCO/ANSUL undertook a study and investigation on how to improve its AFFF to address its environmental impact. TYCO/ANSUL was also clearly aware of the environmental and toxic concerns of its AFFF.

147.  AFFF fluorinated surfactants have demonstrated to have unique properties that cause some of the compounds to not biodegrade and instead to bioaccumulate.

148.  It is well established that PFOS and PFOA are readily absorbed after consumption, inhalation or dermal absorption, and it accumulates primarily in the blood stream, kidney, and liver.

149.  In 2002, 3M stopped manufacturing and using these chemicals. At that time, 3M also announced that they would completely phase out the use of all PFAS (Per- and polyfluoroalkyl substances) by the end of 2025.

150.  In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

---

[18] 3MA00326828

151. Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the EPA's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95%, no later than 2010.

152. PFOA remains in the environment, particularly in water, for years and/or an indefinite amount of time, and can move through air, soil, and into groundwater.

153. Human studies show associations between increased PFOA levels in blood and an increased risk of health conditions, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

154. Consumption of elevated levels of PFOS and/or PFOA from contaminated water will lead to elevated serum PFOS and/or PFOA levels with evidence that for every 10 ppt consumed from contaminated water, serum levels increase by 25%, thereby causing a doubling of serum levels at 40 ppt. Once biological uptake occurs, the clinical effect can be proximate to the exposure or following a latency or both.

155. According to the EPA's Lifetime HAs, the adverse health effects observed following exposure to PFOS are the same as those observed with PFOA, meaning injuries associated with PFOS exposure and accumulation similarly manifest themselves months or years after initial exposure.

156. Due to the extreme persistence of PFOS and PFOA in the environment, these chemicals' toxicity, mobility, and bioaccumulation potential pose ongoing and probable adverse effects to human health and the environment.

157.  Accordingly, all Defendants knew or should have known that the properties of their AFFF products and the PFOA and PFOS the products contained included but were not limited to the following:

   a.  Easily dissolved in water and highly mobile (The products were designed to be mixed with water and are highly mobile as evidenced by extremely fast formation of the thin film. The AFFF behaved exactly as designed);

   b.  Resistant to degradation and persistence in the environment. (The very nature of the products' chemical composition and long shelf-live was well known to the industry);

   c.  Highly absorbed by humans through ingestion, breathing, dermal absorption among other mechanisms;

   d.  Bio-accumulative (In or before 1976, there were widespread and well publicized studies regarding the presence of substances with carbon-fluorine bonds in the blood of the general population.);

   e.  Toxic and Carcinogenic;

   f.  And otherwise, harmful to humans.

158.  With full knowledge of the health concerns related to the use of its AFFF (PFOS / PFOA) products, and the major waste management problems created by their products, Defendants still failed to provide any practical guidance to end users and/or customers on how to deal with the known environmental contamination risks. The defendants simply washed their hands of the problem by simply transferring it to the end users.

159.  Moreover, the Defendants failed to warn and share information with their customers and the general public about the impact of their products including but not limited to the following acts of commission and/or omission:

   a.  Failure to warn of the general contamination of the environment.

   b.  Failure to warn of the contamination of unprotected water sources.

   c.  Failure to warn of the contamination of the soil.

    d.   Failure to warn of the danger of bioaccumulation.

    e.   Failure to warn of the Carcinogenic Dangers related to use and/or contact with the products.

    f.   Failure to warn of the danger of dermal absorption.

    g.   Danger of ingestion through contamination, including but not limited to water sources.

    h.   Danger of Non-Biodegradable nature of the products.

## C. HEALTH ADVISORIES AND HEALTH EFFECTS RELATING TO PFOS AND PFOA

160. Many parties have studied PFOS and PFOA, sometimes referred to as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

161. The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

162. The non-cancer health effects of PFOS are the same as PFOA.

163. In the May 2015 "Madrid Statement on Poly and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe nonfluorinated alternatives to these products to avoid long-term harm to human health and the environment.[19]

---

[19] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

164. On May 25, 2016, the EPA released a lifetime health advisory (HAs) and health effects support documents for PFOS and PFOA.[20] See Fed. Register, Vol. 81, No. 101, May 25, 2016. The EPA developed the HAs to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAs identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAs were based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFOSs. These studies indicate that exposure to PFOS and PFOA over these levels may result in adverse health effects, including:

a. Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

b. Cancer (testicular and kidney);

c. Liver effects (tissue damage);

d. Immune effects (e.g., antibody production and immunity);

e. Thyroid disease and other effects (e.g., cholesterol changes).

165. Many states, however, have issued lower regulatory limits. For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level (MCL) of 14 ppt for PFOA.

166. Currently Florida follows the EPA level of 70 ppt for combined PFOA and PFOS levels.

167. In addition, PFOS and PFOA are hazardous materials because they pose a "present or potential threat to human health." Id; see also, National Ass'n for Surface Finishing v. EPA, 795

---

[20] See Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

F.3d 1, 3, 6 (D.C. Cir. 2015) (referring to PFOS as a "toxic compound" and a "hazardous chemical.").

168.  On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015.

169.  PFOS and PFOA are such contaminants. Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems, 77 Fed. Reg: 26072 (May 2, 2012).

170.  In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[21]

171.  The IARC concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[22]

172.  California has listed PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.

---

[21] See U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate (Sept. 2016), at 1, 17, 19, https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf
[22] See Int'l Agency for Research on Cancer, IARC Monographs: Some Chemicals Used as Solvents and in Polymer Manufacture (Dec. 2016), at 27, 97, http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

173.  In June, 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to **11 ppt for PFOA and 7 ppt for PFOS**.

**D.  AFFF USAGE AND RESULTING PFOS AND PFOA CONTAMINATION AT FIRE COLLEGE AND COLLEGE OF CENTRAL FLORIDA – THE CAMPUS AND CAMPUS ADJACENT PROPERTIES**

174.  As alleged herein, for decades firefighter personnel used PFOS and PFOA containing AFFF products that were manufactured, designed, sold, supplied and/or distributed by each of the above-named Defendants for training operations at FIRE COLLEGE, including firefighting and explosion training. Over this course of time, well over one hundred (100) combined firefighter instructors and trainees used the Defendants' AFFF products while training and/or working at FIRE COLLEGE.

175.  FIRE COLLEGE was at all material times a state owned and operated facility. It was part of the Florida Department of Financial Services, Division of the State Fire Marshall.

176.  Defendant COLLEGE OF CENTRAL FLORIDA is a state owned and operated facility, managed by District Board Trustees of Central FL. Community College which is appointed by the Florida governor and confirmed by the Florida Senate

177.  The Defendants' AFFF products was expected to and did reach FIRE COLLEGE without substantial change in the condition on which the Defendants sold it.

178.  At all times material, the Defendants were responsible for the design, manufacture and distribution of thousands of gallons of AFFF products used and stored at FIRE COLLEGE.

179.  Due to these training operations, AFFF was released into the surrounding air, soil, and groundwater at locations including, but not limited to, the former fire training area located at FIRE COLLEGE campus, now the grounds of the COLLEGE OF CENTRAL FLORIDA (FIRE

39

COLLEGE campus and COLLEGE OF CENTRAL FLORIDA collectively hereinafter referred to as "THE CAMPUS"), and further contaminating the water supplies located in, around and at distances contaminating CAMPUS ADJACENT PROPERTIES.

180.  On or about August 2018, the Florida DEP obtained samples from the three wells that provide water supplies to FIRE COLLEGE, including, the water running through the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains located throughout FIRE COLLEGE campus. The Florida DEP determined that the PFOS and PFOA levels in the drinking water in two of the three wells measured 250 ug/L and 270 ug/L, respectively. This is equivalent to 250,000 – 270,000 parts per trillion (ppt), which vastly exceeds the EPA's current health-safety level at 70 ppt and even further exceeds the ATSDR recommended levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

181.  As a direct and proximate result of the failure to warn and/or properly instruct the student, employees, and other persons at FIRE COLLEGE, AFFF and its constituents, including PFOA and PFOS, were permitted to persistently contaminate the air, soil, and groundwater, ultimately entering the Class Plaintiffs' and the Putative Class Members' bodies and continue to bio-accumulate.

182.  Subsequently, FIRE COLLEGE was sold to Defendant COLLEGE OF CENTRAL FLORIDA, and as a direct and proximate result of the failure to warn students, employees and other persons at Defendant, COLLEGE OF CENTRAL FLORIDA's campus, including those most sensitive to contamination, AFFF and its constituents were permitted to enter the air, soil, and groundwater at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, ultimately entering the Class Plaintiffs' and the Putative Class Members' bodies.

183.  Upon information and belief, instructions, warning labels, and material safety data sheets that Defendants provided with the AFFF did not reasonably nor adequately describe the health and environmental hazards of AFFF that Defendants knew or should have known.

**E. THE PLAINTIFFS AND PUTATIVE CLASS MEMBERS' EXPOSURES TO PFOS AND PFOA AND DAMAGES**

184.  The Class Plaintiffs and Putative Class Members have been injured as a result of their unknowing and non-consensual consumption, inhalation and/or dermal absorption of PFOS and/or PFOA from Defendants' AFFF products at concentrations hazardous to their health.

185.  The Class Plaintiffs and Putative Class Members have suffered from bioaccumulation of PFOS and/or PFOA in their bodies as a result of their frequent contact, proximity to, use, and/or handling of AFFF in the course of their employment and/or training and/or studies at THE COLLEGE OF CENTRAL FLORIDA / THE CAMPUS and/or due to their proximity in CAMPUS ADJACENT PROPERTIES. The Class Plaintiffs and each of the Putative Class Members have been contaminated with PFOS and/or PFOA due to their exposure to the PFCs in their concentrated forms through their exposure to AFFF. Additionally, or alternatively, the Class Plaintiffs and Putative Class Members have suffered from bioaccumulation of PFOS and/or PFOA in their bodies as a result of the PFOS and PFOA contamination of the water supplies by AFFF releases that contaminated THE CAMPUS's and/or CAMPUS ADJACENT PROPERTIES' water supply.

186.  The Class Plaintiffs and Putative Class Members who trained and/or worked at COLLEGE OF CENTRAL FLORIDA / THE CAMPUS and those living and/or working in the CAMPUS ADJACENT PROPERTIES, have been unknowingly exposed to significantly elevated PFCs including concentrations hazardous to their health.

41

187. The Class Plaintiffs and Putative Class Members having an ownership interest in the CAMPUS ADJACENT PROPERTIES have sustained a loss in the form of diminution of value, if not a total loss of value in CAMPUS ADJACENT PROPERTIES.

188. Plaintiffs seek recovery from Defendants for injuries, damages and losses suffered by the Plaintiffs as a direct and proximate result of their exposure to PFOS, PFOA, and other toxic substances arising from their frequent exposure to the Defendants' AFFF products, and for the diminution in value of CAMPUS ADJACENT PROPERTIES stemming from their persistent contamination, in an amount to be determined at trial, exclusive of interest, costs, and attorney's fees.

189. Given that the long-term health effects of PFOS and/or PFOA have not been exhaustively studied, and given that, based on studies that have been done, there is compelling evidence that both malignant and nonmalignant effects result from PFOS and/or PFOA exposure, and because the full extent of latency of such effects has not yet been determined, periodic diagnostic medical exams for populations with PFOS and/or PFOA exposure from contaminated water are reasonably necessary.

190. Sustained exposure to PFOS and/or PFOA substantially increases the risk to the Plaintiffs and the putative Class members of contracting the serious latent diseases alleged herein.

191. As a result of the sustained exposure and substantial increased risk of contracting the serious latent diseases alleged herein, periodic medical examinations by qualified licensed medical professionals are both reasonable and necessary to permit early detection of latent diseases in the Plaintiffs and the putative Class members.

192. Additionally, given the well-established non-biodegradable and persistent nature of PFOS and PFOA, periodic testing of the soil and well water in the CAMPUS ADJACENT PROPERTIES

are both reasonable and necessary due to a potential increasing hazard of bioaccumulation for an indeterminate period in the future.

## F. AFFF CONTAINING PFOS AND PFOA IS FUNGIBLE AND COMMINGLED IN THE GROUNDWATER

193.   Identification of the company that manufactured the AFFF containing PFOS and/or PFOA is difficult at best and impossible at worst because it lacks the markers and/or characteristics that enable manufacturer source identification once released into the environment.

194.   A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF coming from different manufacturers.

195.   For example, the case here in THE CAMPUS is typical: even though several areas were located at FIRE COLLEGE where AFFF was used and entered the groundwater, investigators could not determine the identity of all the manufacturers whose AFFF containing PFOS and PFOA contributed to the resulting groundwater contamination plume. Atypically, in the instant matter, identification of at least one of the contributing manufactures, although not to the exclusion of other contributing manufacturers, was possible due to some remaining stock of National Foam's AER-O-Foam XL-3 3%, on FIRE COLLEGE site when the Florida DEP obtained its samples.

196.   Because precise identification of the specific manufacture of any given AFFF that was the source of PFOS and PFOA found in a Class members' blood, a water well, or the groundwater, is nearly impossible, given certain exceptions, Plaintiffs must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Class Plaintiffs and the Putative Class Members.

197.   Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF containing PFOS and PFOA, at Class Plaintiffs' and the Putative Class Members' expense, to contaminate THE CAMPUS' and

CAMPUS ADJACENT PROPERTIES' water supply, and to attempt to avoid liability for such contamination of the groundwater and poisoning of the Plaintiffs and the Class.

## G. MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY

198. Defendants in this action are manufacturers that control a substantial share of the market for AFFF containing PFOS and/or PFOA in the United States and are jointly responsible for the contamination of the water supply at THE CAMPUS and CAMPUS ADJACENT PROPERTIES and for causing the damages and injuries alleged herein. Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF containing PFOS and/or PFOA at issue in this Complaint. PFOS and PFOA are fungible; it is nearly impossible to identify the exact Defendant who manufactured any given batch of AFFF containing PFOS and/or PFOA found free in the air, soil or groundwater, and each of these Defendants participated in a FLORIDA state-wide and national market for AFFF containing PFOS and/or PFOA during all times relevant to the allegations herein.

199. Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts in concert alleged herein and each of which acted tortuously in pursuit of the common plan to knowingly manufacture and sell inherently dangerous AFFF containing PFOS and/or PFOA.

200. Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

## V.  CLASS ALLEGATIONS

201.  The Plaintiffs, for themselves and on behalf of a Class of similarly-situated individuals, bring this action seeking to recover damages for injuries to their person and for medical monitoring resulting from their use of PFOS and PFOA containing AFFF products and/or from exposure to

groundwater, surface water, and affected areas contaminated with PFOS and/or PFOA at THE CAMPUS and CAMPUS ADJACENT PROPERTIES from AFFF products that were manufactured, designed, sold, supplied and/or distributed by each of the above-named Defendants.

A. CLASS DEFINITION

202. Plaintiffs propose two (2) classes and sub-classes and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery. The proposed sub-classes, and the Plaintiffs who seek to represent those classes, are as follows:

    a. PFOS and/or PFOA Invasion Injury Class: This Class is composed of the following sub-classes:

    (1) Employee Sub-class: All individuals who were employed at COLLEGE OF CENTRAL FLORIDA that sustained bioaccumulation of PFOS and/or PFOA in their bodies and:

    (i) who have suffered personal injury as a result of their frequent contact, proximity to, use, and/or handling of AFFF; and/or

    (ii) who have suffered personal injury as a result of their exposure to the PFOS and/or PFOA contaminated water at the CAMPUS.

The proposed class representative is Plaintiff Jerelyn Zache.

    (2) Non-Employee Sub-class: All non-employee individuals, including staff members and other individuals, that sustained bioaccumulation of PFOS and/or PFOA in their bodies and who have suffered personal injury as a result of their exposure to the PFOS- and/or PFOA- contaminated water at THE CAMPUS and/or CAMPUS ADJACENT PROPERTIES.

203. The proposed class representatives is Plaintiff, Jerelyn Zache.

    b.   Medical Monitoring Class: All individuals who sustained bioaccumulation of PFOS and/or PFOA in their bodies and/or were exposed to PFOS and/or PFOA contaminated water at THE CAMPUS.[23]

The proposed class representative is Plaintiff, Jerelyn Zache.

    c.   Diminution in Property Value Class: All individuals who own an interest in CAMPUS ADJACENT PROPERTIES who sustained a loss to the value of the property as a result of PFOS and/or PFOA contaminated water migrating from THE CAMPUS to their property.

The proposed class representative is Plaintiff, Jerelyn Zache.

    d.   Property Testing and Monitoring Class: All individuals who own an interest in CAMPUS ADJACENT PROPERTIES whose property has been exposed to PFOS and/or PFOA by migration of contaminated water from THE CAMPUS and/or by way of spraying and/or dissipation in the environment.

The proposed class representative is Plaintiff, Jerelyn Zache.

204. Plaintiffs are members of the proposed Sub-Classes they seek to represent. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

205. Excluded from the Classes are:

    a.   Defendants, their officers, directors, management, legal representatives, employees, assigns, heirs, successors, and wholly owned or partly owned subsidiaries and affiliates;

    b.   Any judges or justices involved in this action and any members of their immediate families;

    c.   Any Class counsel or their immediate family members; and

    d.   All governmental entities.

---

[23] Under Florida law, plaintiffs are entitled to bring a claim for medical monitoring despite absence of physical injury and the court may create, supervise, and implement a medical monitoring plan under certain guidelines and circumstances. See Petito v. A.H. Robbins Company, Inc., 750 So. 2d 103 (Fla. 3d DCA 1999).

206. Plaintiffs reserve the right to amend the Class and Sub-Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

207. This action meets the numerosity requirement of Florida Rules of Civil Procedure 1.220, because the number of impacted individuals, upon information and belief, has reached the hundreds if not thousands making individual joinder of class members' respective claims impracticable. While the exact number of Class members is not yet known, a precise number can be ascertained from the Florida Department of Financial Services, Division of State Fire Marshall, COLLEGE OF CENTRAL FLORIDA records, Florida Department of Environmental Protection, County Property Tax Collector, and through other appropriate discovery.

B. NUMEROSITY AND ASCERTAINABILITY

208. The prosecution of separate claims or defenses by or against individual Putative Class Members would create a risk of inconsistent or varying adjudications concerning individual members of the class which would establish incompatible standards of conduct for the parties opposing the class.

209. The resolution of the claims of the Class members in a single action will provide substantial benefits to all parties and the Court. It is expected that the Class members will number in the hundreds if not thousands.

210. Finally, Class members can be notified of the pendency of this action by Court approved notice methods.

C. TYPICALITY

211. Pursuant to Florida Rule of Civil Procedure 1.220(c)(2)(B), Plaintiffs' claims are typical of the claims of Class members and arise from the same course of conduct by Defendants and would

give rise to a common defense as to each member of the class. Plaintiffs' persons, like all Class members, have been damaged by Defendants' misconduct in that they have incurred damages and losses related to their use and/or consumption, inhalation, or dermal absorption of PFOS and/or PFOA from the Defendants' AFFF products and/or exposure to the PFOS and PFOA contaminated water at the THE CAMPUS. Plaintiffs' properties, like all Class members, have been damaged by Defendants' misconduct in that they have incurred damages and losses in the form of contamination and/or diminution in value of their CAMPUS ADJACENT PROPERTIES due to Defendants' AFFF products and/or exposure to the PFOS and PFOA

212. Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class members and represent a common thread of misconduct resulting in common injury to all Class members. The relief Plaintiffs seek is typical of the relief sought for absent Class members.

D.  ADEQUACY OF REPRESENTATION

213.  Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the Class they seek to represent.

214.  Further, Plaintiffs have retained counsel competent and well experienced in class action litigation, mass tort litigation, and environmental tort litigation.

215.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to the Class.

E.  COMMONALITY / PREDOMINANCE OF COMMON ISSUES

216.  There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members, making it appropriate to

bring this action under Rule 1.220. The answers to these common questions will advance resolution of the litigation as to all Class members. These common legal and factual issues include the following:

a.  Whether Defendants engaged in the conduct alleged herein;

b.  Whether Defendants knew or should have known that exposure to PFOS and PFOA could increase health risks;

c.  Whether Defendants knew or should have known that their manufacture of AFFF containing PFOS and PFOA was unreasonably dangerous;

d.  Whether Defendants knew or should have known that their AFFF contained persistent, stable and mobile chemicals that were likely to contaminate groundwater water supplies;

e.  Whether Defendants failed to sufficiently warn users of the potential for harm that resulted from use of their products and resulting uncontained contamination of the environment;

f.  Whether Defendants became aware of health and environmental harm caused by PFOS and PFOA in their AFFF products and failed to warn users and Plaintiffs and the Class of same;

g.  The extent to which Defendants knew about the PFOS and PFOA contamination in the water at the THE CAMPUS and CAMPUS ADJACENT PROPERTIES;

h.  Whether the Defendants owed a duty to the Plaintiffs and the Class to refrain from the actions that caused the contamination of the water with PFOS and PFOA;

i.  Whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of PFOS and PFOA;

j.  For the Medical Monitoring Classes, whether the risk of any health issue or bodily injury of Plaintiffs and the Class are attributable to exposure of PFOS and PFOA in the Defendants' AFFF products and/or to exposure to the PFOS and PFOA contaminated water at THE CAMPUS and CAMPUS ADJACENT PROPERTIES;

k.  For the Property Testing and Monitoring Classes, whether the risk of contamination and diminution in value of CAMPUS ADJACENT

PROPERTIES are attributable to exposure of PFOS and PFOA in Defendants' AFFF products and/or to exposure to the PFOS and PFOA contaminated water and/or air migrating to the CAMPUS ADJACENT PROPERTIES; and,

k.  Whether Plaintiffs and Class members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount.

F.  SUPERIORITY

217.  The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Further, no unusual difficulties are likely to be encountered in the management of this class action. Given that a great number of individuals have been impacted by the Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims individually due to the risk of producing inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism minimizes prospective management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

## VI. <u>CAUSES OF ACTION</u>

### COUNT I
### NEGLIGENCE AND GROSS NEGLIGENCE

218.  Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 217 above, and further allege the following:

219.  At all times material, the Defendants manufactured, designed, formulated, marketed, tested, promoted, supplied, sold, and/or distributed their respective AFFF products containing PFOS and PFOA into the stream of commerce in the regular course of business.

220. Defendants owed a duty to Plaintiffs to act in a reasonably prudent manner and not place inherently dangerous AFFF into the marketplace and/or stream of commerce when its release into the environment would imminently and within a reasonably degree of probability and/or certainty contaminate the environment, soil, wells, water tables and the drinking water supplies within and beyond the immediate use area.

221. At all times material, the Defendants owed a duty to warn of the hazards inherent to their respective AFFF products containing PFOS and PFOA and/or reformulate the subject products to eliminate said hazards.

222. At all times material, the Defendants owed a duty to conduct testing, studies and/or investigations of their AFFF products containing PFOS and PFOA prior to introducing them into the stream of commerce.

223. At all times material, the Defendants owed a duty to warn about the results of their testing, studies and/or investigations and/or otherwise publicly disclose the results and/or findings of their testing, studies and/or investigations of their AFFF products containing PFOS and PFOA prior to introducing them into the stream of commerce.

224. At all times material, Defendants knew or should have known that exposure to PFOS and PFOA was hazardous to the environment and to human health.

225. At all times material, Defendants also knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health, bioaccumulated in the blood, and caused serious health effects, including cancer.

226. At all times material, Defendants knew or should have known that people exposed their AFFF products would be exposed to PFOS and PFOA released from the AFFF.

227.  At all times material, Defendants also knew or should have known that PFC's are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

228.  At all times material, Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the persistent and indefinite contamination of the well drinking supplies at fire training academies, like THE FLORIDA STATE FIRE COLLEGE / THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

229. Defendants intentionally and/or negligently marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFC's would be used in training exercises and in emergency situations at the fire training academies, like THE FIRE COLLEGE / THE CAMPUS in such a manner that dangerous chemicals would be released into the environment due to the frequency and volume of use in a particular geographic area.

230. Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFC's would be stored in fire suppressant systems and tanks and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the environment.

231.  Knowing of the dangerous and hazardous properties of AFFF, and the manner in which AFFF would be used, stored, and maintained at fire training academies, like FIRE COLLEGE, it was foreseeable that AFFF and the PFOS and PFOA would contaminate the surrounding environment, groundwater, and drinking water supplies of THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

232.  Knowing the indestructible and non-biodegradable nature of PFOS and PFOA contained in AFFF, the Defendants negligently and/or intentionally concealed these characteristics from the

customers and end users of the product causing the release of PFOS and PFOA into the environment without any precautions, thereby exposing Class Plaintiff's and Putative Class Members to health risks associated with PFOS and PFOA.

233. Defendants knew or should have known that safety precautions would be required to prevent the release of PFOS and PFOA into the surrounding environment, groundwater, and drinking water supplies.

234. The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiffs and the Class was minimal when all that was required of the defendants was to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF products.

235. As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF products.

236. Defendants knew or should have known that the indestructible characteristics of the "*FOREVER CHEMICALS*" PFOS and PFOA would result in permanent or essentially permanent contamination of the water, soil and environment, and exposure to everyone coming in contact with the contaminated areas.

237. Defendants knew or should have known that the "*FOREVER CHEMICALS*" PFOS and PFOA would drain into and spread beyond the immediate use area migrating into and/or onto adjacent properties.

238. It was reasonably foreseeable to the Defendants that individuals such as the Class Plaintiffs and The Putative Class Members would be exposed to areas contaminated with PFOA and PFOS.

239. It was reasonably foreseeable to the Defendants that individuals such as the Class Plaintiffs and The Putative Class Members who owned properties where AFFF was released into the environment would sustain damages in the form of diminution of value and the costs of necessary

testing and monitoring in the future due to AFFF use and PFOA and PFOS contamination and accumulation.

240. Considering the above factors related to risk, foreseeability, social utility, burden of guarding against the harm, and the practical consequences of placing that burden on the Defendants, the Defendants therefore owed a cognizable duty to Plaintiffs and the Class not to contaminate their water supplies and the surrounding environment and groundwater with AFFF, containing dangerous levels of PFC's.

241. Defendants had a duty to warn of the hazards associated with AFFF, containing PFC's, entering and poisoning the environment and groundwater.

242. Defendants, as manufacturers, marketers, and sellers of AFFF owed Plaintiffs and the Class a cognizable duty to exercise reasonable care to ensure that AFFF was manufactured, marketed, and sold in such a way as to ensure that the end users of AFFF and all those exposed to AFFF were aware of the potential harm PFOS and PFOA can cause to human health and the environment.

243. Upon learning of the release of the contaminants, all Defendants owed Plaintiffs and the Class a duty to warn and notify Plaintiffs and the Class of the release of the contamination before it injured Plaintiffs and the Class and their property and/or to act reasonably to minimize the damage to Plaintiffs and their property.

244. Defendants breached their duty by allowing PFOS and PFOA to be released into the water supplies and into the environment at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, by and through their failure to warn and notify the end users of AFFF about the danger that PFOS and PFOA would enter and contaminate the environment and groundwater.

245. Each Defendant who was in the business of manufacturing, designing selling, supplying and/or distributing AFFF products during the times pertinent to this suit was negligent and/or failed

to exercise reasonable care in one, some and/or all the following acts of commission and/or omission, the same being the proximate cause of Class Plaintiffs' and the Putative Class Member's injuries[24]:

a. Failing to properly test, study and/or investigate AFFF containing PFOA and PFOS in a reasonably prudent manner;

b. Failing to formulate AFFF containing PFOA and PFOS in a reasonably prudent manner;

c. Failing to design AFFF containing PFOA and PFOS in a reasonably prudent manner;

d. Failing to provide an adequate warning of the inherently dangerous characteristics to human health of AFFF containing PFOA and PFOS;

e. Failing to provide reasonably prudent and/or adequate instructions on the use of AFFF containing PFOA and PFOS;

f. Failing to provide reasonably prudent and/or adequate instructions on management and/or containment of waste contaminants relating to the use of AFFF containing PFOA and PFOS;

g. Failing to publicly disseminate and/or communicate the hazards inherent to the use of AFFF containing PFOA and PFOS;

h. Failing to test locations and/or surrounding geographic areas where AFFF was used and/or reasonably suspected to have been used;

i. Failing to provide reasonably prudent and/or adequate warning to individuals such as the Class Plaintiffs and the Putative Class members occupying, visiting, and/or otherwise working and/or coming into contact with the contaminated THE CAMPUS and/or CAMPUS ADJACENT PROPERTIES.

j. Failing to market AFFF containing PFOA and PFOS in a reasonably prudent manner;

k. Intentionally marketing AFFF containing PFOA and PFOS in a manner designed to conceal the inherent hazards relating to contamination when using PFOA and PFOS.

---

[24] The following subsections (a-g) contain allegations of fact (not allegations of law) supporting Plaintiffs' claim for negligence. Thus, Plaintiffs are not alleging that Defendants are subject to any legal requirement or legal duty not recognized under Florida law.

246.  As a direct and proximate result of the Defendants' breach of duty by and through their acts of commission and/or omission, Class Plaintiffs and the Putative Class Members of the Employee sub-class suffered damages and/or injuries as follows:

a.  Non-Consensual exposure to hazardous PFOS and PFOA contaminants;

b.  Intentional infliction and/or negligent infliction of emotional distress due to exposure to hazardous PFOS and PFOA contaminants;

c.  Non-Consensual Consumption of hazardous PFOS and PFOA contaminants;

d.  Non-Consensual Inhalation of hazardous PFOS and PFOA contaminants;

e.  Non-Consensual Dermal absorption of hazardous PFOS and PFOA contaminants;

f.  Non-Consensual bioaccumulation of hazardous PFOS and PFOA contaminants;

g.  In failing to publish and/or otherwise disseminate known risks of diseases related to exposure to PFOS and PFOA including but not limited to kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants.

h.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt and enforce a safety plan and a safe method of handling and disposing of AFFF products;

i.  In failing to develop and utilize a substitute material to eliminate PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed;

j.  In failing to utilize the available substitute materials for PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed by the Defendants;

k.  Continuing to sell and otherwise distribute AFFF products when each Defendant knew at the time of sale and/or distribution of said products, that such products caused injuries including, but not limited to, kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of

being exposed to PFOS and/or PFOA emitted from each Defendant's products; and

l.   In failing to adequately test their respective AFFF products before putting them into the stream of commerce for sale and use so that Plaintiffs and other persons similarly situated, would not consume, inhale, or sustain dermal absorption of PFOS and/or PFOA released from the ordinary and foreseeable use of said products and thereby indefinitely exposing the Plaintiffs and Class members into the future to the development of fatal injuries including, but not limited to, kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFOS and/or PFOA emitted from each Defendant's products.

247.   As a direct and proximate result of the Defendants' breach of duty by and through their acts of commission and/or omission, Class Plaintiffs and the Putative Class Members of the Non-Employee sub-class suffered damages and/or injuries as follows:

a.   Non-Consensual exposure to hazardous PFOS and PFOA contaminants;

b.   Intentional infliction and/or negligent infliction of emotional distress due to exposure to hazardous PFOS and PFOA contaminants;

c.   Non-Consensual Consumption of hazardous PFOS and PFOA contaminants;

d.   Non-Consensual Inhalation of hazardous PFOS and PFOA contaminants;

e.   Non-Consensual Dermal absorption of hazardous PFOS and PFOA contaminants;

f.   Non-Consensual bioaccumulation of hazardous PFOS and PFOA contaminants;

g.   In failing to publish and/or otherwise disseminate known risks of diseases related to exposure to PFOS and PFOA including but not limited to kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants.

h.   In failing to take reasonable precautions or exercise reasonable care to publish, adopt and enforce a safety plan and a safe method of handling and disposing of AFFF products;

57

i.   In failing to develop and utilize a substitute material to eliminate PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed;

j.   In failing to utilize the available substitute materials for PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed by the Defendants.

248.  As a direct and proximate result of the Defendants' breach of duty by and through their acts of commission and/or omission, Class Plaintiffs and the Putative Class Members of the Medical Monitoring sub-class suffered damages and/or injuries as follows:

a.   Non-Consensual exposure to hazardous PFOS and PFOA contaminants;

b.   Intentional infliction and/or negligent infliction of emotional distress due to exposure to hazardous PFOS and PFOA contaminants;

c.   Non-Consensual Consumption of hazardous PFOS and PFOA contaminants;

d.   Non-Consensual Inhalation of hazardous PFOS and PFOA contaminants;

e.   Non-Consensual Dermal absorption of hazardous PFOS and PFOA contaminants;

f.   Non-Consensual bioaccumulation of hazardous PFOS and PFOA contaminants;

g.   In failing to publish and/or otherwise disseminate known risks of diseases related to exposure to PFOS and PFOA including but not limited to kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants.

h.   In failing to take reasonable precautions or exercise reasonable care to publish, adopt and enforce a safety plan and a safe method of handling and disposing of AFFF products;

i.   In failing to develop and utilize a substitute material to eliminate PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed;

      j.  In failing to utilize the available substitute materials for PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed by the Defendants

249.  As a direct and proximate result of the Defendants' breach of duty by and through their acts of commission and/or omission, Class Plaintiffs and the Putative Class Members of the Diminution in Property Value sub-class suffered damages and/or injuries as follows:

      a.  Contamination of CAMPUS ADJACENT PROPERTIES with PFOS and PFOA;

      b.  In failing to publish and/or otherwise disseminate information of known risks of contamination related to exposure to PFOS and PFOA including but not limited to kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, so as to put CAMPUS ADJACENT PROPERTY owners on notice of the gravity of the contamination to their properties.

      c.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt and enforce a safety plan and a safe method of handling and disposing of AFFF products;

      d.  In failing to develop and utilize a substitute material to eliminate PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed;

      e.  In failing to utilize the available substitute materials for PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed by the Defendants

250.  As a direct and proximate result of the Defendants' breach of duty by and through their acts of commission and/or omission, Class Plaintiffs and the Putative Class Members of the Property Testing and Monitoring sub-class suffered damages and/or injuries as follows:

      a.  Contamination of CAMPUS ADJACENT PROPERTIES with PFOS and PFOA;

      b.  In failing to publish and/or otherwise disseminate information of known risks of contamination related to exposure to PFOS and PFOA including but not limited to kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed

infants, so as to put CAMPUS ADJACENT PROPERTY owners on notice of the gravity of the contamination to their properties.

c.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt and enforce a safety plan and a safe method of handling and disposing of AFFF products;

d.  In failing to develop and utilize a substitute material to eliminate PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed;

e.  In failing to utilize the available substitute materials for PFCs, including PFOS and PFOA, in the AFFF products manufactured, designed, sold, supplied and/or distributed by the Defendants; and,

f.  In failing to clean, mitigate and/or remediate THE CAMPUS and/or CAMPUS ADJACENT PROPERTIES requiring continuing costly testing and/or monitoring of the contaminated properties.

251.  The damages and/or injuries sustained by Class Plaintiffs and the Putative Class Members were directly and/or proximately caused by the PFOS and PFOA released from the Defendants' AFFF products. Class Plaintiffs and Putative Class Members of the Employee sub-class's exposure to each Defendant's products, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its products, was harmful and substantially contributed in causing the Plaintiffs', and each of the Putative Class Members', injuries to their person.

252.  At all times material, Class Plaintiffs and Putative Class Members of the Employee Sub-class, sustained bioaccumulation of PFOS and/or PFOA in their bodies and have suffered personal injury as a result of their exposure to the PFOS and/or PFOA contaminated water at THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

253.  The damages and/or injuries sustained by Class Plaintiffs and the Putative Class Members were directly and/or proximately caused by the PFOS and PFOA released from the Defendants' AFFF products. Class Plaintiffs and Putative Class Members of the Non-Employee sub-class's exposure to each Defendant's products, which were connected to and incidental to Defendants'

manufacture, design, sale, supply and/or distribution of its products, was harmful and substantially contributed to causing the Plaintiffs', and each of the Putative Class Members', injuries to their person.

254.  At all times material, Class Plaintiffs and Putative Class Members of the Non-Employee Sub-class, sustained bioaccumulation of PFOS and/or PFOA in their bodies and have suffered personal injury as a result of their exposure to the PFOS and/or PFOA contaminated water at THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

255.  At all times material, Class Plaintiffs and Putative Class Members of the Property Owners sub-class sustained damages as a result of contamination and diminution of value to their properties that were connected and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its products, was harmful and substantially contributed in causing the Plaintiffs', and each of the Putative Class Members', loss of value to their properties and need for testing and monitoring of said properties for PFOA and PFOS contamination into the future.

256.  At all times material, Class Plaintiffs and Putative Class Members of the Property Owners sub-class, sustained economic damages in the form of diminution of value to their properties by failing to clean, mitigate and/or remediate THE CAMPUS and/or CAMPUS ADJACENT PROPERTIES requiring continuing costly testing and/or monitoring of the contaminated properties.

257. As such, the Defendants, negligently, grossly negligently, recklessly, willfully, wantonly, and/or intentionally breached their legal duties to the Plaintiffs and the Class, causing the contamination of the water supplies and environment in and around THE CAMPUS and CAMPUS ADJACENT PROPERTIES.

258.  Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' and the Class's injuries, damages, and the imminent, substantial, and impending harm to their health.

259.  Defendants' breaches of their duties directly and proximately resulted in the contamination of the water in wells and environment at THE CAMPUS and CAMPUS ADJACENT PROPERTIES with unsafe and dangerous levels of PFOS and PFOA.

260.  Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs and the Class, Defendants' acts of commission and/or omission resulted in known, recognizable and foreseeable danger to Plaintiffs and the Class that was so apparent as to entitle them to be protected against such actions or inactions.

261.  As a direct and proximate result of the negligent acts and/or omissions described in this Count, proposed class representatives, Plaintiffs  were caused to suffer serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, embarrassment, inconvenience, loss of capacity for the enjoyment of life, the expense of medical care and treatment, loss of earnings, loss of the ability to earn money, aggravation of a pre-existing condition, and economic damages in the form of diminution of property values. The losses are either permanent or continuing in nature and the Plaintiffs will suffer the losses in the future.

262.  Accordingly, Plaintiffs and the Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons, in a sufficient amount to compensate them for the injuries and losses sustained, injuries to persons, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT CO.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC. (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC. (f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC., FLORIDA STATE FIRE COLLEGE, and COLLEGE OF CENTRAL FLORIDA for damages in excess of TEN BILLION DOLLARS ($10,000,000,000.00), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

## COUNT II
## STRICT LIABILITY

263. Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 217 above, and further allege the following:

264. Each Defendant, their predecessors-in-interest and/or their alter egos are and/or have been a manufacturer, distributor, supplier, retailer, wholesaler and/or assembler of AFFF products containing PFOS and/or PFOA.

265. The products complained of were manufactured, designed, sold, supplied and/or distributed by each of the Defendants and used in and around THE CAMPUS contaminating same, including

but not limited to  and contaminating CAMPUS ADJACENT PROPERTIES exposing the Plaintiffs and Class members to PFOS and PFOA contamination of, including soil, above surface and below surface water, man-made and/or natural wells, physical buildings, plumbing, facilities and/or infrastructure at THE CAMPUS.

266.  Defendants knew or should have reasonably known that exposure to PFOS and PFOA was hazardous to the environment and to human health.

267.  Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling AFFF, containing concentrated PFC's, was hazardous to human health and the environment.

268.  Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of those who handled, used, came into contact with, transported, etc., the product, as well as the contamination at fire training academies, like FIRE COLLEGE.

269.  Knowing of the dangerous and hazardous properties of the AFFF, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFOS and/or PFOA.

270.  These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

271.  The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to the Plaintiffs that was caused by the Defendants' manufacture, marketing, and sale of AFFF that contained PFOS and/or PFOA.

272.  Additionally, the AFFF that was manufactured, marketed, and sold by the Defendants contained PFOS and PFOA that were so toxic and unreasonably dangerous to human health and

the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, and selling this product was unreasonably dangerous under the circumstances.

273.  Further, this contamination then led to the exposure of the employees, students and persons who exposed to the AFFF to the toxins and increased their risk of contracting numerous diseases as more fully set forth above.

274.  Additionally, this contamination led to the contamination of properties adjacent to THE CAMPUS resulting in diminution of value and the need for ongoing mitigation, remediation, testing and monitoring.

275.  The AFFF manufactured, marketed, and sold by the Defendants was dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

276.  Defendants' products were in a defective condition and unreasonably dangerous, in that those products[25]:

    a.  Did not provide an adequate warning of the potential harm that might result from exposure to PFOS and/or PFOA emitted from the AFFF products and, alternatively, did not have adequate instructions for safe use of the products;

    b.  Did not have warnings to persons, such as Plaintiffs and the Class members who had been, or reasonably may have been, exposed to Defendants' AFFF products, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects, including, but not limited to, kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental

---

[25] The following subsections (a-d) contain allegations of fact (not allegations of law) supporting Plaintiffs' claim for strict liability. Thus, Plaintiffs are not alleging that Defendants are subject to any legal requirement or legal duty not recognized under Florida law.

effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFOS and/or PFOA emitted from each Defendant's products;

c.  Did not provide instructions and/or warnings to end users of the AFFF products to post and/or otherwise provide warnings to Plaintiffs and the Putative Class Members that would foreseeably come into contact with water, soil and the general environment of areas contaminated by and/or potentially contaminated by PFOS and/or PFOA by posting, marking and/or otherwise providing a visual warning to Plaintiffs and Putative Class Members that the subject areas posed a safety and/or health related danger.

d.  Did not provide instructions and/or warnings to end users of the AFFF products to post and/or otherwise provide warnings to the sub-class of Plaintiffs and the Putative Class Members consisting of CAMPUS ADJACENT PROPERTY owners that would foreseeably come into contact with water, soil and the general environment of areas contaminated by and/or potentially contaminated by PFOS and/or PFOA by posting, marking and/or otherwise providing a warning to Plaintiffs and Putative Class Members that the subject areas posed a safety and/or health related danger.

e.  Did not provide instructions and/or warnings to end users of the AFFF products to post and/or otherwise provide warnings to the sub-class of Plaintiffs and the Putative Class Members consisting of CAMPUS ADJACENT PROPERTY owners whose property would foreseeably sustain diminution in property value because of the contamination, thereby depriving them of an opportunity to mitigate and/or take measures to contain and/or eliminate the contamination of their properties.

f.  By design AFFF contained PFCs, including PFOS and/or PFOA, toxic chemicals that are deleterious, poisonous, and highly harmful to Plaintiffs and the Class members; or

g.  Continued to contain PFCs, including PFOS and/or PFOA, when and after it became feasible to design, manufacture and market reasonably comparable products not containing PFCs, including PFOS and/or PFOA.

277. FIRE COLLEGE instructors, students, trainers and personnel, unaware of the defective and

unreasonably dangerous condition of Defendants' products at a time when such products were

being used for the purposes for which they were intended, released AFFF into the environment,

including PFOS and/or PFOA, without taking precautions against contamination of soil, water and/or the environment.

278.  Each Defendant knew that their products would be used without inspection for defects, and by placing them on the market, represented that they would safely do the job for which they were intended, which must necessarily include the safe handling, installation and replacement of said AFFF products.

279.  Defendants' defective design and formulation of AFFF was a direct and proximate cause of the environmental and health impacts from PFOS, PFOA, and potentially other toxic substances, that came from the use and storage of AFFF at THE CAMPUS.

280.  As a result of Defendants' defective design and formulation of AFFF, the resulting contamination, the Class Plaintiffs and Putative Class Members have been injured in that their exposure to PFOS, PFOA, and potentially other toxic substances has increased their risk of developing illnesses associated with this exposure as more fully described and/or significantly increased their fear of developing those illnesses.

281.  As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable for damages to the Plaintiffs.

282.  As a direct and proximate result of the acts and/or omissions described in this Count, Proposed Class Representatives and Putative Class Members were caused to suffer serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, embarrassment, inconvenience, loss of capacity for the enjoyment of life, the expense of medical care and treatment, loss of earnings, loss of the ability to earn money and aggravation of a pre-existing condition and economic damages in the form of diminution of property values. The losses are either permanent or continuing in nature and the Plaintiffs will suffer the losses in the future.

283. Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and the Class members.

284. Accordingly, Plaintiffs and the Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons, in a sufficient amount to compensate them for the injuries and losses sustained, injuries to persons, and actual, consequential, and nominal damages, flowing from the Defendants' strict liability which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT CO.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC. (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC. (f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC., FLORIDA STATE FIRE COLLEGE, and COLLEGE OF CENTRAL FLORIDA for damages in excess of TEN BILLION DOLLARS ($10,000,000,000.00), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

## COUNT III
## MEDICAL MONITORING

285.  Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 217 above,
and further allege the following:

286.  Medical monitoring is available to Plaintiffs and Class members who have yet to sustain a
present injury as a stand-alone cause of action as the increased risk of developing the diseases and
conditions discussed supra constitute an injury-in-fact and also as an element of damages
associated with Plaintiffs and Class members other claims for those Plaintiffs and Class members
who have sustained a present injury.

287.  Under Florida law, a claim for medical monitoring requires: (1) exposure greater than normal
background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence;
(4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting
a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the
disease possible; (6) the prescribed monitoring regime is different from that normally
recommended in the absence of the exposure; and (7) the prescribed monitoring regime is
reasonably necessary according to contemporary scientific principles. See *Petito*, 750 So. 2d at
106-107; see also, *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 852 (3rd Cir. 1990); *Krottner v.
Starbucks Corp.*, 628 F.3d 1139, 1142 (9th Cir. 2010).

288.  Defendants knew or should have known that the manner in which they were manufacturing,
marketing, and selling AFFF containing PFC's would result in the contamination of the water
supplies of fire training academies, like FIRE COLLEGE.

289.  Defendants knew or should have known that exposing humans to PFC contaminated water
would be hazardous to human health and the environment.

290. Here, the Plaintiffs have been exposed to PFOA, PFOS, and potentially other toxic substances at levels greater than normal background levels of PFOS and PFOA, as a direct and proximate result of their use and/or consumption, inhalation or dermal absorption of PFOS and/or PFOA from the Defendants' AFFF products. The Florida DEP's water samples demonstrate that PFOS and PFOA levels detected in the contaminated water supplies at FIRE COLLEGE, ranging between 250,000 – 270,000 ppt, are more than 3,000 times the EPA's health-safety level of 70 ppt.

291. As such, the Class Plaintiffs and Putative Class Members are at an increased risk of developing serious adverse health effects that resulted from the use, storage, and discharge of AFFF at FIRE COLLEGE.

292. As described more fully above in this Complaint, PFOA and PFOS exposure leads to the bioaccumulation of PFOA and PFOS in the blood, seriously increasing the risk of contracting serious adverse and latent diseases, including, but not limited to, kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFOS and/or PFOA emitted from each Defendant's products. Medical tests currently exist that can determine the level of PFOS and PFOA in the blood.

293. Given that exposure to and bioaccumulation of PFOA and PFOS significantly increases the risk of contracting a serious medical condition, periodic medical examinations to detect latent diseases are both reasonable and necessary. A thorough medical monitoring plan, following common and accepted medical practices, can and should be developed for the Plaintiffs and the Classes to assist in the early detection and beneficial treatment of the diseases that can develop as a result of exposure to PFOS and PFOA.

294.  Medical monitoring and testing protocols and procedures exist that make the early detection of the diseases correlated to the exposure to PFOS and PFOA possible and beneficial.  These may include a comprehensive medical questionnaire completed by the patient; periodic and comprehensive medical examinations by qualified licensed medical professionals; and specific testing based on the patient's history, PFOS and/or PFOA exposure, symptoms or health consequences, clinical considerations and/or medical examination results. Available laboratory testing includes but is not limited to testing of biomarker and organ system function.

295.  For the early detection of the latent diseases alleged herein, the qualified licensed medical professionals may utilize specific evaluations and/or laboratory testing of biomarker and organ system function as follows:

    a. Thyroid function:

        (1) Thyroid stimulating hormone (TSH); and

        (2) Free thyroxine (FT4).

    b. Liver function:

        (1) Albumin;

        (2) Aspartate Aminotransferase (AST/SGOT);

        (3) Alanine Aminotransferase (ALT/SGPT);

        (4) $\gamma$-glutamyltransferase (GGT);

        (5) Bilirubin; and

        (6) Alkaline Phosphatase.

    c. Uric Acid:

        (1) Serum.

    d. Kidney Cancer:

(1) Urinalysis.

e. Lipids:

    (1) Total cholesterol;

    (2) High-density lipoprotein (HDL);

    (3) Low-densitylipoprotein (LDL); and

    (4) Total triglycerides.

f. Evaluation for testicular cancer:

    (1) Scrotal ultrasound followed by radiographic testing, measurement
    of serum tumor markers;

    (2) Radical inguinal orchiectomy; and/or

    (3) Retroperitoneal lymph node dissection

g. Evaluation for kidney cancer:

    (1) Urine culture;

    (2) Ultrasound of kidneys;

    (3) Abdominal pelvic CT scan; and/or

    (4) Cystoscopy.

h. Reproductive/infertility issues:

    (1) Evaluation by a fertility specialist if, after 12 months, a couple has
    failed to conceive.

i. Gestational hypertension:

    (1) Screening for evidence of gestational hypertension and preeclampsia
    for women in their second and third trimesters of pregnancy.

j. Androgen dysregulation:

    (1) Evaluations to assess androgen levels.

k. Indications of ulcerative colitis:

(1) Evaluation of erythrocyte sedimentation rate;

(2) Evaluation of serum C-reactive protein; and/or

(3) Colonoscopic evaluation.

296. Using the data collected from comprehensive medical questionnaires completed by the patients, periodic and comprehensive medical examinations, laboratory testing and results, and other specialized evaluations, as alleged herein, qualified licensed medical professionals may predict, detect, and treat these diseases early, thus benefiting the Plaintiffs and Class Members and reducing the likelihood of their premature morbidity, disability, or mortality.

297. Accordingly, Plaintiffs and the Classes seek damages from the Defendants, including an order requiring them to fund a medical monitoring program to be created, supervised and implemented by the court in equity.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT CO.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC. (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC. (f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC., FLORIDA STATE FIRE COLLEGE, and COLLEGE OF CENTRAL FLORIDA for damages in excess of Five Million

Dollars ($5,000,000), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

**COUNT IV**
**CONTAMINATED PROPERTY MITIGATION, REMEDIATION, TESTING AND MONITORING**

298.  Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 217 above, and further allege the following:

299.  Mitigation, remediation, testing and monitoring of the contaminated properties is available to Plaintiffs and Class members who have either sustained contamination to properties in which they own an interest or have yet to sustain contamination as a stand-alone cause of action due to the continuing persistence and migration of PFOA and PFOS released into the environment and ground water at THE CAMPUS and CAMPUS ADJACENT PROPERTIES, as discussed supra constituting an injury-in-fact and also as an element of damages associated with Plaintiffs and Class members other claims for those Plaintiffs and Class members who have sustained the actual diminution of value to their property.

300.  Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the water supplies, environment and soil of fire training academies, like FIRE COLLEGE.

301.  Defendants knew or should have known that PFC contaminated water would migrate through the air, soil and water throughout the area of use and adjacent properties.

302.  Here, the Plaintiffs' properties have been exposed to and/or contaminated with PFOA, PFOS, and potentially other toxic substances at levels greater than normal background levels of PFOS and PFOA, as a direct and proximate result of this contamination the Florida DEP's water samples

demonstrate that PFOS and PFOA levels detected in the contaminated water supplies at THE CAMPUS, ranging between 250,000 – 270,000 ppt, are more than 3,000 times the EPA's health-safety level of 70 ppt.

303. Due to the high mobility of the PFOA and PFOS chemicals and non-biodegradable characteristics, the CAMPUS ADJACENT PROPERTIES have been contaminated through the migration of these chemicals within a reasonable degree of probability and/or there exists a reasonable basis that there is continuing risk of contamination.

304. As described more fully above in this Complaint, PFOA and PFOS exposure leads to the bioaccumulation of PFOA and PFOS in the blood, seriously increasing the risk of contracting serious adverse and latent diseases, including, but not limited to, kidney and testicular cancer and related diseases, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFOS and/or PFOA emitted from each Defendant's products. Contamination of properties with PFOA and PFOS posing these risks results in complete loss of value and/or diminution of value of contaminated properties.

305. Given that exposure, persistence, migration and bioaccumulation of PFOA and PFOS significantly increases the risks of property contamination, mitigation, remediation, testing and monitoring are all reasonable and necessary. A thorough testing and monitoring plan for the CAMPUS and CAMPUS ADJACENT PROPERTIES, following common and accepted scientific practices, can and should be developed and implemented for the Plaintiffs and the Classes to assist in the early detection, mitigation and remediation of their properties as a result of the contamination with and/or exposure to PFOS and PFOA.

306. Soil, water and environmental monitoring and testing protocols and procedures exist that make detection of PFOS and PFOA possible and beneficial.

307. Accordingly, Plaintiffs and the Classes seek damages from the Defendants, including an order requiring them to fund a soil, water and environmental monitoring program to be created, supervised and implemented by the court in equity.

308. Moreover, Plaintiffs and the Classes seek additional damages from the Defendants, including an order requiring them to fund a soil, water and environmental mitigation and/or remediation program to be created, supervised and implemented by the court in equity.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT CO.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC. (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.), individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC. (f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC.), individually and as successor-in-interest to NATIONAL FOAM, INC., FLORIDA STATE FIRE COLLEGE, and COLLEGE OF CENTRAL FLORIDA for damages in excess of TEN BILLION DOLLARS ($10,000,000,000.00), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

## COUNT V
## PUNITIVE DAMAGES

309.  Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 217 above, and further allege the following:

310.  At all times material, the Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs and Class members would result, and despite that knowledge, willfully, wantonly, and recklessly pursued their course of conduct.

311.  The Defendants' conduct was so gross and flagrant as to show a reckless disregard or a conscious wanton, reckless indifference to consequences or a grossly careless disregard for the life, safety, or rights of the Plaintiffs and Class members, and the Defendants actively and knowingly participated in such conduct, and/or their officers, directors, or managers knowingly condoned, ratified or consented to such conduct.

312.  Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFOA and PFOS, which they knew to be hazardous to human health and property, including but not limited to be carcinogenic, were not manufactured, marketed, sold  and/or otherwise released into the environment warranting the imposition of punitive damages.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); TYCO FIRE PRODUCTS L.P., as successor-in-interest to THE ANSUL COMPANY; BUCKEYE FIRE EQUIPMENT CO.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC. (f/k/a CHUBB NATIONAL FOAM, INC. f/k/a NATIONAL FOAM, INC.), individually and as successor in interest to NATIONAL FOAM, INC.;

KIDDE PLC, INC. (f/k/a WILLIAMS US INC. f/k/a WILLIAMS HOLDINGS, INC.),
individually and as successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC.
(f/k/a FENWAL INC.), individually and as successor-in-interest to NATIONAL FOAM, INC.; and
UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE INTERLOGIX, INC.),
individually and as successor-in-interest to NATIONAL FOAM, INC., FLORIDA STATE FIRE
COLLEGE, and COLLEGE OF CENTRAL FLORIDA for damages in excess of TEN BILLION
DOLLARS ($10,000,000,000.00), for interest, and for such other and further relief both at law and
in equity to which Plaintiffs and Class Members may show to be justly entitled, including punitive
damages, and demand a trial by jury of all issues triable as a matter of right by a jury.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs for themselves and on behalf of all others similarly situated,
demand judgment against Defendants, and each of them, jointly and severally, and request the
following relief from the Court:

    a.  Certification of the proposed Classes;

    b.  A declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and members of the Classes;

    c.  an order establishing a medical monitoring protocol for Plaintiffs and the Class;

    d.  an order requiring that Defendants fund the medical monitoring protocol;

    d.  an order establishing a property monitoring protocol for Plaintiffs and the Class;

    e.  an order requiring that Defendants fund the property monitoring protocol;

    e.  an award to Plaintiffs and the Class of general, compensatory, exemplary, consequential, nominal, and punitive damages;

f.   an order for an award of attorney fees and costs, as provided by law;

g.   an award of pre-judgment and post-judgment interest as provided by law; and

h.   an order for all such other relief the Court deems just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs for themselves and on behalf of all others similarly situated, demand a trial by jury of all issues so triable as a matter of right.

## X. DESIGNATION OF EMAIL ADDRESS

Furthermore, pursuant to Florida Rule of Judicial Administration 2.516(b)(1), the undersigned law firm hereby designates the following primary email address:

Primary email:    pleadings@hlalaw.com

All pleadings, motions, orders, correspondence, and/or other papers should be served on the undersigned at the email address set forth above.

Orestes "Rusty" Perez, Esq
P.O. Box 840638
Pembroke Pines, Florida 33084
(954) 210- 7752 Telephone
(954) 678-5920  Facsimile
rustyperezlaw@gmail.com

/s/ Orestes "Rusty" Peres
Orestes "Rusty" Perez, Esq
Florida Bar No. 21393

Hoffman, Larin & Agnetti, P.A.
909 North Miami Beach Blvd.
Suite 201
Miami, FL. 33162
(305) 653 5555 Telephone
pleadings@hlalaw.com

/s/ John B Agnetti
John B. Agnetti, Esq.
Florida Bar No. 359841

Hoffman, Larin & Agnetti, P.A.
909 North Miami Beach Blvd.
Suite 201
Miami, FL. 33162
(305) 653 5555 Telephone
pleadings@hlalaw.com

/s/ Michel Reyes Triana
Michel Reyes Triana, Esq.
Florida Bar No. 1065084